No. 3679

Second Circuit

TAYLOR v. SOUTHERN ENGINEERING CONSTRUCTION CO.

(January 31, 1930. Opinion and Decree.)

Peterman, Dear & Peterman, of Alexandria, attorneys for plaintiff, appellee.

Hawthorn & Stafford and John L. Pitts, of Alexandria, attorneys for defendant, appellant.

DREW, J. Plaintiff institutes this suit for compensation under the Employers' Liability Act (Act No. 20 of 1914, as amended) of Louisiana, claiming to be totally disabled due to an injury received while working for defendant and performing duties necessary to his employment. Defendant denies that plaintiff was injured while in the employ of it, denies that he is disabled, and, if he is disabled, that it was brought about by causes other than those alleged by plaintiff.

Plaintiff prayed for judgment for 65 per cent of his wages for a period of not more than 400 weeks. The lower court rendered judgment for plaintiff for the amount of 32½ per cent of his wages for a period of not more than 300 weeks. Defendant appealed, and plaintiff answered the appeal praying that the judgment of the lower court be amended by increasing the amount to the amount sued for, and, as amended, that the judgment be affirmed.

The admitted and uncontradicted facts in the case are: That plaintiff was employed by defendant to work on a pile driver in the construction of a bridge near Pollock, in Grant parish, La., and, while so engaged in said employment and in furtherance of defendant company's business, and while acting in the scope of his employment, he fell from a piling a distance of from 15 to 25 feet into the water of the stream underneath the bridge. That he fell on his back. That he swam and waded out of said stream and walked a distance of several hundred yards to a tent where he was sleeping. That he took his meals at a house some half mile distant from his sleeping quarters, and that he did not go to supper the night of the injury or to breakfast the next morning. He went to work the next morning after the fall, working all that day and the following day until 4 o'clock in the evening, at which time the entire crew stopped. Plaintiff walked several miles and rode a freight train a distance of 30 or 40 miles that evening and night, the second day after the accident, in order to get to his home. He did not go back to work after this, and was confined to his bed, complaining of his back for 2 weeks or more, and partially confined to his bed for a period of 3 or 4 months, and that he had to have help to get in and out of bed and to turn over for a part of that time. That the defendant's physicians, Drs. Scott and Glass, treated plaintiff for a strained or sprained back about seven days after the accident, and reported to the company that he had a sprained back, and they strapped him up with adhesive tape at that time. They continued to treat him until about March 30, 1928. That the accident occurred on January 5, 1928.

Prior to the accident, plaintiff had been engaged in heavy manual labor and had never complained of his back, and since the accident, up to the time of trial—a period of nearly 18 months—the plaintiff, with the exception of the 2 days immediately following the accident, had not worked but 5½ days, and he testified that he felt that he should work, if possible, to help support his four children, and that he secured a job spotting pipe on a pipe line and the work caused him much pain, and after 5½ days, he was forced to give up the job, could not stand the pain, and could barely make it home after the last day's work.

Defendant, acting on the report of its doctors, paid plaintiff compensation from the date of accident up to June 18, 1928, amounting in all to $358.80, and that nothing has been paid since.

The first controversial question of fact is: Did the plaintiff complain of injury to his back immediately after the accident? Defendant argues and relies to a great extent on this fact, urging that he did not complain at the time of the accident and for the two days afterwards, and in the examination of the doctors, urges this as a fact to elicit testimony to negative the idea of the accident causing any disability. Defendant offers the evidence of Roy Hammonds, foreman of defendant company, who testified that he reached plaintiff soon after he had gotten out of the water and asked him if he was hurt, to which he replied, he was not; that the next morning he asked plaintiff if he felt 'any effects of the fall, and he replied he did not, that he was sick with a cold; that plaintiff made no complaint all of the two following days. Doc Butts, a brother-in-law of Hammonds, also an employee of defendant company, testified that he overheard plaintiff tell Hammonds that he was not hurt; that he saw plaintiff undress soon after the accident and there were no cuts or scratches on the back of plaintiff. Testimony of Robert Weaver, an employee of defendant, was offered by defendant. Weaver testified that he talked to plaintiff soon after the accident and asked him where he was hurt. Plaintiff replied he was sore around the back. Another place in his testimony he was asked the following questions:

"Q. Did any one ask Taylor where he was hurt?
"A. Yes.
"Q. Did Taylor complain of being hurt, or mention being hurt or injured? What did he say about being hurt?
"A. He never said anything only that his back bothered him a little."

This defense witness is in direct conflict with the testimony of defense witnesses Hammonds and Butts; however, he does corroborate them about plaintiff not complaining while at work the following two days.

Plaintiff denies talking to Hammonds and Butts, and testifies that the witness W. C. Ford, was first to reach him after the accident, that he told Ford he was hurt, and that Ford ran ahead of him to the tent and made a fire and got out some dry clothes for plaintiff. Witness W. C. Ford corroborates plaintiff in every respect. He is entirely a disinterested witness, an employee of the highway commission, having no connection with either plaintiff or defendant. He testified that he was present when plaintiff got out of the water, that he heard plaintiff say he was hurt, and saw him walking slowly and bent over, and from this concluded that he was injured.

Plaintiff testified that on the evening he was trying to get home, January 7, 1928, he was hurt and tried to get some one to carry him home in a car, but did not succeed; that, on the way to Antoine, where he caught the freight train, he stopped at Mr. P. D. Allen's house and tried to get him to carry him, stating to Mr. Allen that he had been hurt. This testimony is corroborated by Mr. Allen and another witness, B. Price.

The testimony of W. C. Ford, Robert Weaver, the plaintiff, P. D. Allen, and B. Price, coupled with the fact that plaintiff, a man who was engaged in manual labor all day, not going to his supper on the evening he was injured nor his breakfast the next morning, and the undisputed fact that he was confined to his bed for some time after the accident, the testimony of Drs. Scott and Glass, of the defendant company, that plaintiff had a sprained or strained back when they examined him at the company's request 9 days after the accident and the report made by these doctors to the insurance company, of date

January 16, 1928, wherein they say the injury was probably a sacroiliac strain, and in reply to question, "Are symptoms due entirely to injury?" they answer "Yes," and the fact that plaintiff never had complained of his back before the accident, all convinces the court, not only that plaintiff complained of the injury received immediately after the accident, but is also convincing that the fall received by plaintiff did injure him, as alleged, and that he was totally incapacitated for work such as he was accustomed to do and the only kind of work he was competent to perform.

Having determined that the plaintiff was injured, as alleged, and that he was, at that time, totally disabled, within the meaning of the Employers' Liability Act, the only remaining question for determination is: Was the plaintiff, at the time of the trial in the lower court, still totally disabled, or partially disabled, or had he recovered from his injury, and, if so, when.

Ten doctors testified in the case, and we will discuss their testimony in the order in which it appears in the record.

Dr. Rand examined the plaintiff on two different occasions, and says his conclusion at the first as well as at the second examination was that he had a definite sacroiliac strain, and that it would have been remarkable for plaintiff to have described the symptoms if they had not been there; that an X-ray picture would not necessarily show the injury of plaintiff, due to the peculiar, irregular shaped joint, the plane between the sacrum and ileum not being a straight surface, but curved; that he had patients where the X-ray showed normal condition and yet there was an injury to the sacroiliac joint, strain in that region; that plaintiff was slightly stooped from waist down when he saw him, had pain, and showed inability to handle himself readily, and his functions were impaired. One of his examinations was in November, 1928.

Dr. M. Cappel, now deceased, made two examinations of plaintiff, one on January 19, 1929, and the other on June 20, 1929. He testified that one can sustain a severe injury to the muscles, ligaments, and nerves of the back, which injuries will not show up in an X-ray picture, that the X-ray picture of plaintiff showed abnormal formation of the sixth lumbar vetebra, and that such a back was more susceptible to injury than a normal back, and that it is possible not to have a severe pain immediately following an accident such as plaintiff sustained. He is positive that plaintiff has a sacroiliac sprain. He says that he has two cases now where the patients have been disabled for about two years, where the X-ray did not show anything, and a recent case where the X-ray does not show anything, that plaintiff is not suffering from bad tonsils or bad teeth, and that he has a disability, and that it impairs his functions and produces pain in the effort to do ordinary manual labor, and that such a strain or sprain as plaintiff has may not be as painful when first inflicted as it becomes later.

Dr. J. I. Peters, who examined the plaintiff for the insurance company, made two examinations, one in January, 1929, and the other in June, 1929, is the best expert witness for the defendant. He was assisted in the last examination by Dr. D. C. McBride. He says that on his first examination he found nothing the matter with plaintiff; that he put plaintiff through all manner of exercises, and that plaintiff was not impaired in his functions; that he did not ask plaintiff if the examination caused him any pain; and that, from his examinations and the reports of other inspectors he was

led to believe that plaintiff was faking injury. As to his second examination, made with Dr. McBride, he says:

"We found no evidence of injury, by the X-ray, which was the basis of our conclusion in the matter. We did find, however, that he complained of stiffness in the back. We also found diseased tonsils and teeth. It is our impression there is a direct connection between the tonsils and teeth and the condition of plaintiff's back; that it is a contributing factor, at least. That he complained of pain in his back; came here with pain in his back, but exercised all the functions without showing signs of pain more than the constant backache which he had all the time.

"Q. I will ask you, then, if he was suffering from pain, what was the cause of it?

"A. I think it was lumbago; plainly lumbago, due to other pathological causes quite as much, if not more, than the alleged injury; and I base this answer on the X-ray report showing an anomaly of the spine, which he was born with, together with the fact that he has sources of septic absorption which could easily produce this, and we are not able to base the interpretation of the finding of the symptoms on the examination that we made with the X-ray."

He says the X-ray would not show the condition of ligaments or tendons. He further testified that he would not say it is impossible for a patient to suffer a severe sprain of the sacroiliac joint sufficiently to incapacitate him without there being some bony injury or some separation of bony relations or some callous formation from the bony injury later on that would show in the X-ray picture, but that he would say it was improbable for such an injury to exist without there being some of them, enough to base a reasonable interpretation of the injury on.

The plaintiff moved a lot more languidly, with apparent stiffness, and complained of pain more, at the second examination than at the first, that his diagnosis was lum-

bago, and that the sacroiliac joint is the favorite seat for lumbago.

Dr. McBride, who assisted Dr. Peters in his last examination, says: Examination of back showed that he had some stiffness in the lumbar sacro spine or lower part of the back. Also he complained of pain over the sacroiliac region and crest of ileum. Examination of extremities showed some difficulty in completely flexing or extending thighs of his own accord; he was limited in flexion and extension and rotation of his spine. I believe this was due to absorption from some source of infection in his body; usually in these cases it is the teeth or tonsils; that plaintiff's teeth and tonsils could cause his complaint. He found no evidence of injury, although he could have had this sprain immediately after falling. He concludes plaintiff was suffering from some impairment of sacroiliac region, and he surely had some pain. He further testified:

That "it is possible after receiving the injury to have foci infection, or an infection in some other part of the body to cause trouble."

"Q. Do I understand that this fall might have started the trouble brewing?

"A. It is possible for it to contribute to it; yes.

"I think the condition of his teeth and tonsils probably has made his point of injury more painful; that is possible; however, the anomalous condition of his vertebra may have also exaggerated conditions. Having anomalous vetebra, weak back, and having sustained this fall, would at least contribute to any present disability that he is now suffering. The fall may have been the beginning of his trouble, which the points of infection have continued to cause pain and his present trouble.

"Q. Is it your opinion, doctor, that he is a normal man at this time, able to do hard manual labor?

"A. I think he could, after his tonsils and teeth are removed.

"Q. I mean at this time, doctor?
"A. No; probably not."

He further testified that it is probable the injury has had something to do with the present condition of plaintiff, and that any point that is injured, especially joints, tend to be subject to irritation, to be points of infection throughout the body. Finally, he was asked the following question:

"Q. Doctor, isn't it your opinion that this man has long since gotten over any injury or disability that he might have suffered from the fall? .
"A. It is; excepting the possibility of his fall predisposing to his present condition."

Dr. L. A. Myers, the radiologist who made the pictures in this case, testified that a sprain is a traumatic injury of the ligaments that is not shown by an X-ray picture, unless it left a widening of some joint or definite injury to the bony frame work; that plaintiff's back, being abnormal, would be weaker than a normal back. He was asked the following question:

"Q. Basing your opinion on the picture, do you think the man suffered severe sprain at any recent date?
"A. I do not believe I could be able to answer that."

Dr. Earl Jones testified that plaintiff is suffering from a sprain of the sacroiliac joint and will suffer disability all his life; that he is incapacitated to do manual labor, and that his injury resulted from the fall; that an X-ray picture is not a satisfactory basis for diagnosing a trouble such as he found plaintiff suffering from; and that an injury such as plaintiff received would not cause much pain for 2 or 3 days.

Dr. J. W. Scott testified that he would not expect any pain from such a fall as plaintiff got before 6 or 8 hours after; that he diagnosed plaintiff's case as a strain or sprain of the back, and treated him for it.

Saw him once or twice a week for 2 or 3 months, and discharged him as well.

Dr. Woodall testified that plaintiff is undoubtedly suffering from a severe sprain in both sacroiliac joints; that he is not able to do manual labor and will not be for 2 or 3 years, and possibly not for life; that his teeth and tonsils are not the cause of his trouble; and that these kinds of sprains very often do not show up at their worst for 24 or 36 hours and would not cause much pain for several days.

Dr. Woodall examined plaintiff the morning of the day of the trial, and Dr. Jones examined him a short while before the trial.

Dr. Jones also testified that plaintiff's teeth and tonsils were not the cause of his trouble.

Almost without exception all the doctors testify that the plaintiff was suffering with his back, and place the pain at least in the region of the sacroiliac joint, and all the positive testimony is that he could not do manual labor or would feel great pain in performing such labor; and it therefore follows that plaintiff has met the burden that is upon him of proving his case with a preponderance of evidence.

While Drs. Peters and McBride contend that plaintiff's trouble is due to his infected teeth and tonsils, they are not willing to say that the injury received by the plaintiff at the time of the fall was not a contributing factor to his present condition.

"The compensation paid injured workmen under the compensation statute is based upon disability and it is immaterial whether the injury alone, or in conjunction with a latent systemic infection, caused the disability." Womack vs. New Orleans Public Service, Inc., 5 La. App. 71.

Dr. Peters and Dr. Myers, and other doctors who testified for the defense, say that a sprain as severe as the one claimed by

plaintiff will almost always cause a widening of the bony relation or other bone injury that will be shown by an X-ray picture, and the testimony of Dr. Cappel and other doctors, who testified for the plaintiff, is that such is not the case, and cite numerous cases they have treated in which the injury to the sacroiliac joint was so severe as to cause total disability for several years, in which the X-ray did not show anything. Dr. Peters bases his conclusion almost entirely on the X-ray picture, as does Dr. Myers. But positive testimony will prevail over negative. Consequently, when a doctor, testifying as a medical expert, gives his professional opinion to the effect that a sprain of the sacroiliac joint, severe enough to cause total disability, will not necessarily cause a widening of the bony relations or other bone injury sufficient to show up in the X-ray picture, and declares that he is treating numerous cases of that kind at present in which nothing was shown by the picture, his testimony must prevail over that of another medical expert who expresses the opinion that a sprain to the sacroiliac joint severe enough to cause disability will always show up in the X-ray picture. Womack vs. New Orleans Public Service, Inc., supra.

Counsel for defendant cite numerous decisions of this court in support of their defense, and we have reviewed each of them carefully, and find that they are each distinguished from this case, in that the facts are different.

The plaintiff in this case is shown to be a man of the average ability and learning of his country; that he has never performed any work other than manual labor; and that he is totally disabled for such work. He therefore will come under the total disability clause of the Compensation Law.

Hawthorn vs. Hillyer-Deutach-Edwards, Inc., 9 La. App. 660, 119 So. 772.

Plaintiff was earning a wage of $24 per week at the time of injury, and 65 per cent of his wages would be $15.60 per week, which amount he is entitled to recover for not more than 400 weeks, subject to a credit of $358.80 previously paid to him by defendant.

It is therefore ordered, adjudged, and decreed that the judgment of the district court be amended by increasing the amount therein allowed plaintiff from $7.80 per week during disability, for not more than 300 weeks, to $15.60 per week, during disability, for not more than 400 weeks, subject to a credit of $358.80, and, as thus amended, the judgment of the lower court is affirmed; defendant and appellant to pay all costs of both courts.